[Cite as *State v. Rutledge*, 2025-Ohio-4573.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                          Court of Appeals No.  L-24-1048

      Appellee                    Trial Court No.  CR 23 1676

v.

Marcus Rutledge               **DECISION AND JUDGMENT**

      Appellant                 Decided: September 30, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lorrie J. Rendle, Assistant Prosecuting Attorney, for appellee.

Donald Gallick, for appellant.

* * * * *

**DUHART, J.**

**{¶ 1}** Appellant, Marcus Rutledge, appeals from a judgment entered by the Lucas County Court of Common Pleas convicting him of trafficking in cocaine, possession of cocaine, and receiving stolen property. For the reasons that follow, the trial court's judgment is reversed and remanded for the sole purpose of issuing a nunc pro tunc judgment entry that accurately reflects the Revised Code section under which Rutledge was convicted for trafficking in cocaine.

**Statement of the Case**

**Pretrial Procedural Summary**

**CR-2022-1199**

{¶ 2}   On February 9, 2022, a Lucas County Grand Jury returned a three-count indictment, charging Rutledge with one count each of: (1) trafficking in cocaine in violation of R.C. 2925.03(A)(1) and (C)(4)(a), a felony of the fifth degree (Count 1); (2) possession of cocaine in violation of R.C. 2925.11(A) and (C)(4)(a), a felony of the fifth degree (Count 2); and (3) receiving stolen property valued at $7,500 to $150,000, in violation of R.C. 2913.51 (A) and (C), a felony of the fourth degree (Count 3). Counts 1 and 2 arose out of a controlled buy that was conducted by members of local law enforcement agencies using a confidential informant ("CI"). Count 3 arose after contraband was seized subject to search warrants that were executed at Rutledge's property. Rutledge's property included a twin-plex residential building and a gold-colored storage container that were located at 1628/1630 Bancroft Street, Toledo, Lucas County, Ohio. This case was assigned case No. CR-2022-1199.

{¶ 3}   On April 29, 2022, Rutledge moved to suppress all property seized pursuant to the search warrants. A suppression hearing was held, and on September 13, 2022, the trial court issued a decision granting in part and denying in part Rutledge's motion, with the trial court denying Rutledge's motion to suppress items seized from the residential building but granting the motion to suppress items seized from the gold-colored storage container.

2.

**{¶ 4}**   On April 24, 2023, case No. CR-2022-1199 was dismissed without prejudice.

**CR-2023-1676**

**{¶ 5}**   On May 4, 2023, the Lucas County Grand Jury re-indicted Rutledge, charging him with the same offenses charged in case No. CR-2022-1199. This case was assigned case No. CR-2023-1676.

**{¶ 6}**   On August 3, 2023, Rutledge appeared for arraignment and entered a plea of not guilty to all charges in the indictment.

**{¶ 7}**   On January 11, 2024, the State filed in case No. CR-2023-1676 an opposition to a motion to compel that Rutledge had filed in case No. CR-2022-1199. In this opposition, the State specified that case No. CR-2023-1676 "incorporates the proceedings in case CR22-1199 including the litigation of the Defendant's Motion to Suppress Evidence."

**The Bench Trial and Sentencing**

**{¶ 8}**   On January 22, 2024, Rutledge waived his right to a jury trial in favor of a bench trial. In opening argument, defense counsel explained that the charges against Rutledge arose from certain property seized pursuant to a search warrant. Defense counsel then added that "[t]here was some practice which limited our trial to what it will be here today and into tomorrow."

**{¶ 9}**   On the third and final day of the proceedings, just prior to closing arguments, the trial court addressed storage concerns with regard to State's Exhibits 1-59, 73, and 74, stating:

3.

> [I]t's my understanding that due to the volume and size of some of the exhibits, the court reporters don't have space within their normal storage facility to maintain these exhibits, at least in the short term pending an appeal, if there is an appeal by either side.
>
> It's my understanding the parties have come to a resolution as of this point that at the conclusion of the trial, the exhibits can be taken back to the storage container that is still being held by the Oregon Police Department and placed back into that shipping container.

Defense counsel and the prosecutor affirmed that the trial court's understanding was correct.

{¶ 10} Regarding Count 3, receiving stolen property, the prosecutor requested that if the court were to find that the State did not establish the $7,500 valuation threshold for a felony of the fourth degree, the court consider the lesser included offense as a felony of the fifth degree, which has a valuation requirement of between $1,000 and $7,500. The court agreed, but went one step further, stating, "Certainly the Court would be willing to consider a lesser included if that's where the evidence takes me in my deliberations in terms of the value, and I recognize that it could be one degree lower or possibly two degrees lower or into the misdemeanor range if findings are made that it's below that thousand dollar threshold." Defense counsel then specifically requested that the court only consider the lesser included as a fifth-degree felony. The court then clarified, "If I feel like the State hasn't met its burden in showing that there was stolen property in an amount exceeding $7,500, then I would consider a lesser included offense of a felony of the fifth degree….As long as it's within that range of a thousand to 7,500."

4.

{¶ 11} Ultimately, the court found Rutledge guilty of trafficking in cocaine and possession of cocaine (Counts 1 and 2, respectively, as charged in the indictment), and receiving stolen property valued between $1,000 and $7,500, a felony of the fifth degree (a lesser included offense of Count 3).

{¶ 12} At sentencing, the court merged Counts 1 and 2 for purposes of sentencing, and the State elected to proceed on Count 1. The court ordered Rutledge to serve 11 months in prison for Count 1, trafficking in cocaine, and 11 months in prison for Count 3, receiving stolen property, to be served consecutively, for a total prison term of 22 months.

{¶ 13} Although the offense of trafficking in cocaine is codified under R.C. 2925.03, the judgment entry memorializing the conviction states that the trial court found the Rutledge guilty of trafficking in cocaine, "a violation of R.C. 2905.03(A)(1) and (C)(4), a felony of the fifth degree."

{¶ 14} Rutledge timely filed an appeal.

**Statement of the Facts**

{¶ 15} During its case-in-chief, the State presented the testimony of four witnesses: 1) FBI Agent Mark Evans; 2) Toledo Police Department ("TPD") Detective Kenneth Heben; 3) City of Oregon Police Department Detective Michael Blazevich; and 4) Walmart inventory specialist, Michael Wright. The theory of the State's case was that Rutledge had been operating a criminal enterprise out of his residence on Bancroft Street through which he traded cash and/or drugs for merchandise stolen from various businesses in and around Toledo.

5.

{¶ 16} The following facts were established during Rutledge's trial. On May 24, 2021, Detective Michael Blazevich was called to a report of a larceny at Gladieux Lumber, in the City of Oregon. Someone had broken the front door glass, compromised the interior door, and once inside, had taken "high-end power tools."

{¶ 17} Earlier that month, Blazevich had been assisting Detective Janet Zale with the investigation of a breaking and entering involving the same business. Through their investigation, the detectives discovered that there had been a rash of similar incidents involving small, likely family-owned businesses, where the targeted property appeared to be high-end power tools.

{¶ 18} Blazevich testified that he collected evidence at the scene at Gladieux Lumber on the night of May 24, and reviewed video surveillance at multiple locations related to the case. The detective stated that the investigation revealed at least three individuals who were suspected of being involved in the Oregon thefts. One of those individuals became a CI in case No. CR-2023-1676.

{¶ 19} The CI informed Blazevich that stolen power tools and household items were taken to an individual who was known by the name "Polish" or "P," and traded for money or contraband, namely drugs, and that this person lived on Bancroft Street, in Toledo, Ohio. Using a description of the house and property ("two side-by-side dwellings") and Google Maps, the detective was able to locate a matching property. Blazevich next consulted AREIS Online (Lucas County's property information platform and database) and discovered that the property was owned by Rutledge.

6.

{¶ 20} On May 28, 2021, Blazevich began to conduct surveillance of Rutledge's Bancroft Street property. The detective estimated that he sat outside Rutledge's property for approximately two hours that day, during which he observed "in excess of between five and ten" different individuals arrive on foot, by bicycle, and by car. Blazevich stated that each person stayed for a very short time (less than five minutes). Based on his experience and training, Blazevich testified that that these observations were indicative of drug trafficking.

{¶ 21} The detective explained that Rutledge met some people in the side yard, while other people went to and from the residence or to and from a camper that was on-site. Blazevich clarified that the people arrived with bags but then left empty-handed a short time later. The detective noted that at least one of these bags appeared to contain a power tool. Based on his training and experience, Blazevich explained that these observations confirmed what the CI had told him —that people were exchanging stolen items with Rutledge for money or contraband.

{¶ 22} The CI agreed to participate in a controlled buy, which took place on June 2, 2021. Blazevich testified that he developed the CI for the controlled buy. He confirmed that this was the same CI who was associated with the Gladieux Lumber thefts.

{¶ 23} Detective Kenneth Heban was assigned to the TPD's Metro Drug Task Force, which is comprised of multiple agencies, including the TPD, FBI, and Oregon City Police Department. Heban explained that once an informant has agreed to assist law enforcement by participating in a controlled buy, standard practice requires that investigators meet the informant prior to the exchange and search the individual and his

7.

vehicle, if applicable, for money and contraband. Thereafter, the informant is provided money from the Metro Drug Task Force's fund to make the drug purchase.

{¶ 24} Consistent with this protocol, Blazevich stated that he and Heban met with the CI immediately prior to the controlled buy, that he searched the CI's vehicle for money contraband, and that he observed Heban conduct a similar search of the CI's person. Having found neither, Heban provided the CI with $100 in U.S. currency from the appropriate fund. The CI was to purchase crack cocaine from Rutledge with the funds. Heban and Blazevich followed the CI to Rutledge's Bancroft Street residence. Heban confirmed that the CI made no stops along the way and that no one approached the CI's vehicle.

{¶ 25} The CI was fitted with a transmitter, which permitted law enforcement to hear the controlled buy as it occurred. A recording of the transaction was admitted without objection and was played for the trial court. In the recording, the CI can be heard saying, "Hey, uh, P. Put that in something for me." Blazevich again indicated that he "was told" that Rutledge was also known by the name "Polish" and "P."

{¶ 26} After the CI completed the transaction with Rutledge, Blazevich and Heban followed the CI by car to a predetermined location. Heban testified that the CI again made no stops and that no one approached the vehicle along the way. Once they arrived at the predetermined meeting place, the CI got in the car with Heban and Blazevich and handed them a bag containing crack cocaine that he said he had purchased from Rutledge. The CI and his vehicle were again searched for money and contraband, none of

8.

which was found. Heban confirmed that the CI was not paid for participating in the controlled buy.

{¶ 27} Under cross-examination, Heban explained that when he met the CI at the initial "staging area," he searched the CI's pockets, wallet, and phone case, but did not conduct a "strip search." With regard to the CI's vehicle, Blazevich stated that he searched the passenger compartment, including under the seats, the center console, the sun visor, the glove box, the cup holders, the doors, and any bag or box if applicable.

{¶ 28} Heban estimated that there were approximately 10-15 investigators involved with the controlled buy. The investigators were "spread out throughout the neighborhood," providing surveillance and security, so that at all times, the CI was observed by one or more investigators.

{¶ 29} Special Agent Mark Evans of the FBI testified that he conducted surveillance of the rear stairwell at Rutledge's Bancroft Street residence during the controlled buy. The agent stated that he was parked in an adjacent parking lot, from which he observed the CI and Rutledge walk up the back stairs and enter the residence. A few minutes later, the CI emerged from the same back door and walked down the stairs and out of view. The agent further explained that while he only observed the CI for a brief period of time, once the CI left his sight, another investigator was able to observe the CI.

{¶ 30} Blazevich testified that after the controlled buy was successfully completed, he drafted a search warrant for Rutledge's Bancroft property, which was signed by a judge. Execution of the warrant was postponed, however, due to safety concerns,

9.

including the layout of Rutledge's property, the presence of a large pit bull, described as a "killer, very aggressive dog," and other people and weapons at the residence. It was reported that Rutledge usually carried a firearm in a side holster when he conducted transactions.

{¶ 31} Heban filed a warrant for Rutledge's arrest, and on June 9, 2022, Blazevich along with 10-15 other members of law enforcement attempted to execute the warrants. Because of the safety concerns, the plan was to wait for Rutledge to leave the property and then to initiate a traffic stop on his vehicle, take him into custody, and execute the search warrants. Blazevich testified that although he and the other officers were positioned outside of Rutledge's residence in excess of 10 hours that day, Rutledge never left. Blazevich testified that, similar to his observations on May 28, he saw several people (more than 20) arrive on foot, by bicycle, or by car, some of whom would go up the back steps but all of whom would leave within 5 minutes. Many of these people arrived with bags that appeared to contain power tools and then left empty-handed. Blazevich recalled investigators describing the house as "hot," because they could not believe all of the traffic that was going in and out of Rutledge's residence that day.

{¶ 32} The original search warrant expired, so Blazevich obtained a second set of search warrants for both the addresses on Bancroft Street and for Rutledge's truck. The detective reached out to Sergeant Carey of the Metro Drug Task Force for assistance with executing the warrants. Carey and his team went out to Rutledge's house. Once Rutledge left, Carey called for a TPD marked unit to conduct a traffic stop. Consistent with the

10.

previously described plan, Rutledge was taken into custody and the search warrants were executed at his Bancroft property.

{¶ 33} Blazevich testified that once inside Rutledge's residence, he found many of the items he had previously described in his affidavits. The detective explained why he believed that these items were evidence of a crime, stating:

> Just the sheer number of certain items. I mean, I was looking for – like, I was told he's buying power tools from people. I was looking for things still in packaging; you know, original packaging. I guess it was my opinion of brand new tools. I mean, there was other things that I saw that we didn't touch. I wasn't there for that, but brand new stuff still in the original packaging, maybe spider wrap on it.

{¶ 34} The State presented State's Exhibits 1-59, 73, and 74, each of which consisted of some kind of high-end power tool, kitchen or home appliance, or houseware, that was either new in its original packaging or was in a new and unused condition. The prosecutor questioned Blazevich about all but one exhibit, and in almost every instance asked Blazevich whether the item being discussed had been collected from Rutledge's residence. In every instance that the question about whether the item had been collected from Rutledge's residence was asked, Blazevich answered in the affirmative.

{¶ 35} In an apparent oversight, the prosecutor did not ask Blazevich whether he had recovered certain exhibits from Rutledge's residence, including: State's Exhibit 16, a Cricut machine, stated as having a value of $169.00; State's Exhibit 26, an Orbi Netgear Wi-Fi system, which was never considered for its valuation; State's Exhibit 31, a socket set, which was never considered for its valuation; and State's Exhibits 38 and 42, which were knives that were never considered for their valuation. In addition, the prosecutor

11.

never explicitly asked Blazevich anything about State's Exhibit 17, which was a Shark Vac Mop, stated as having a value of $479.00.

{¶ 36} Blazevich testified that as to each of the 61 items representing State's Exhibits 1-59, 73, and 74, he was present when they were initially seized. He also stated that once these items were collected, they remained under the control of the City of Oregon Police Department. Blazevich explained that through his investigation, he was able to identify the owners of some of these items. The owners were businesses, including Walmart, Meijer, Home Depot, Lowe's, and Menards. According to Blazevich, a Walmart representative came out and inspected the property and confirmed that at least some of the items were stolen.

{¶ 37} Next, the State introduced State's Exhibit 61, the TPD forensic laboratory report conducted by Senior Criminalist Chadwyck Douglas, wherein the item tested was a plastic bag containing .65 grams of off-white chunky material. Douglas determined that the substance was crack cocaine.

{¶ 38} Also introduced was State's Exhibit 63, which consisted of a combination of documents provided by the State and the defense and was admitted by joint stipulation. The documents included Articles of Organization for Polish P LLC Custom Designs. These documents identified Rutledge as the statutory agent of the LLC. Although the documents included three conflicting effective dates, April 26, 2022, April 27, 2022, and May 21, 2020, the LLC's sole intended purpose was described as "to start making custom t-shirts, clothes, etc."

12.

{¶ 39} On cross-examination, Blazevich was shown Defense Exhibit A, an email communication between the detective and a storage container company that sold a shipping container to Rutledge and had purportedly delivered it to him at his Bancroft address on June 4, 2021. According to Blazevich, however, the storage container was already on Rutledge's property on May 28, 2021.

{¶ 40} Defense counsel questioned Blazevich extensively about the CI's involvement in the investigation into Rutledge's criminal enterprise. Blazevich confirmed that the CI was originally a suspect in the Gladieux break-ins. Counsel questioned Blazevich about whether any promises of leniency were made in exchange for cooperation. The detective confirmed that no such promises were made. Blazevich also explained that he had verified that the CI was reliable by contacting an ATF agent who "vouched for" the CI as having previously provided reliable information in other investigations.

{¶ 41} Defense counsel also questioned the detective about the way in which the CI identified Rutledge by photograph. Blazevich testified that the CI had provided a description of Rutledge's Bancroft residence. The detective used the description and consulted AREIS online, where he retrieved a photo of the subject property. When Blazevich showed the CI the photo, the CI confirmed that it was the property previously described. The owner was listed as Rutledge. The detective stated that he also showed the CI a photo of Rutledge, and that the CI confirmed that this was the person known as "P or Polish."

13.

{¶ 42} Next, defense counsel asked Blazevich whether the CI had told him that Rutledge was operating a flea market or pawnshop. The detective confirmed that the CI had told him that was Rutledge's plan.

{¶ 43} Defense counsel also questioned Blazevich extensively about the June 2 controlled buy. Blazevich confirmed that the CI had told him he felt he could make a buy and that he had bought there before.

{¶ 44} The State's final witness was Walmart loss prevention specialist Michael Wright. Wright described how Walmart keeps track of its inventory. He explained that the company's inventory management system enables him to track whether merchandise was purchased or not purchased.

{¶ 45} Wright confirmed that he became involved in the investigation when he went out to the city of Oregon and reviewed merchandise that had been seized from Rutlege's residence.

{¶ 46} Wright testified that Walmart has a tool that permits employees to look up any manufacturer's serial number in order to identify an item by brand and description. He explained that when an item is scanned for purchase at the register, a UPC code is keyed in, and then the system requests the serial number if one is attached to the item. The purchase can only be completed by entering the correct serial number. The serial look-up tool permits the user to run serial numbers and verify whether or not the item has been paid for.

{¶ 47} Next, the prosecutor directed Wright's attention to several previously identified items. Among them, Wright was shown State's Exhibit 27, a Midea Cube smart 14.

dehumidifier, which was wrapped in "spider wrap." Wright confirmed that this was the type of spider wrap that was used at Walmart, and that the store never leaves it on an item that is purchased. Wright explained that if left intact, the device will set off an alarm at the door as it leaves the store.

{¶ 48} Wright explained that Walmart's serial number look-up tool permits employees to identify goods that have been stolen not just from Walmart but from other retailers as well. Wright was shown many of the items among the State's Exhibits 1-59, 73 and 74. By entering the serial numbers of several of the items and cross-referencing Walmart's missing merchandise report, he was able to determine that many of these items, most of which were still in their sealed original packaging, were likely stolen from Walmart.

{¶ 49} Wright was shown State's Exhibit 75, which consisted of a list of some of the items that he concluded were likely stolen from Walmart, along with their retail prices. The total value of these items came to $2,582.94.

{¶ 50} Under cross-examination, Wright conceded that he could not state with 100 percent certainty that the individual items recovered were stolen from Walmart.

{¶ 51} The State rested, and Rutledge moved for acquittal under Crim.R. 29. The trial court denied Rutledge's motion. The defense rested without introducing witness testimony.

{¶ 52} Following closing arguments, the court found Rutledge guilty of Counts 1 and 2, trafficking in cocaine and possession of cocaine, respectively, as indicted. As to

15.

Count 3, the trial court found Rutledge guilty of the lesser included offense of receiving stolen property valued at $2,582.94, a felony of the fifth degree.

## Assignment of Error

{¶ 53} On appeal, Rutledge asserts the following assignments of error:

I.      Appellant's conviction for drug trafficking violated his Sixth Amendment rights to effective assistance of counsel and the Sixth Amendment's Confrontation Clause per *Crawford v. Washington*, as well as plain error.

II.     The trial court erred in overruling the Criminal Rule 29 motion for the crime of receiving stolen property because the State failed to produce evidence to show the mental element of knowingly.

III.    Appellant suffered plain error and a violation of his right to due process when the trial court allowed previously-suppressed evidence to be used during the trial.

IV.     Appellant suffered a Sixth-Amendment deprivation when his trial counsel failed to challenge the State's use of previously-suppressed evidence to prove the offense of receiving stolen property.

V.      The trial court's sentencing entry is erroneous as it sentences appellant on a statutory charge different from the indictment.

## Law and Analysis

**First Assignment of Error**

{¶ 54} Rutledge asserts in his first assignment of error that his trial counsel was ineffective for failing to object to the admission of hearsay testimony regarding statements made by the CI to law enforcement during the investigation into Rutledge's criminal activities. According to Rutledge, he was denied the right to confront the CI, in violation of his rights under the Confrontation Clause. The State disagrees.

16.

{¶ 55} To establish ineffective assistance of counsel, Rutledge must show "'(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different.'" *State v. Warren*, 2024-Ohio-1072, ¶ 38 (6th Dist.), quoting *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151 (2002). "Because 'effective assistance' may involve different approaches or strategies, our scrutiny of trial counsel's performance 'must be highly deferential' with a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *State v. Whitman*, 2021-Ohio-4510, ¶ 51 (6th Dist.), quoting *State v. Bradley*, 42 Ohio St.3d 136 (1989). "A properly licensed attorney in Ohio is presumed to execute his duties in an ethical and competent manner." *Warren* at ¶ 38, quoting *State v. McDonald*, 2015-Ohio-1869, ¶ 18 (6th Dist.), citing *State v. Hamblin*, 37 Ohio St.3d 153, 155-156 (1988).

{¶ 56} The Sixth Amendment to the United States Constitution states, "In all criminal prosecutions, the accused shall enjoy the right…to be confronted by the witnesses against him[.]" The Confrontation Clause bars "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). "If the testimony qualifies as nonhearsay," however "it does not implicate

17.

the Confrontation Clause." *State v. Martin,* 2019-Ohio-4931, ¶ 15 (5th Dist.), citing *Crawford* at 59, citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985).

{¶ 57} "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement.'" Evid.R. 801(C). "Statements offered to explain why an investigation was conducted are generally not hearsay because they are not offered for the truth of the matter asserted." *In re A.K.*, 2021-Ohio-4199, ¶ 10 (1st Dist.), citing *State v. Hackney*, 2016-Ohio-4609, ¶ 20 (1st Dist.). "Nevertheless, a statement that goes beyond describing the steps taken in an investigation and connects the defendant with the crime charged is inadmissible hearsay." *In re A.K.* at ¶ 10, citing *Hackney* at ¶ 23, citing *State v. Ricks*, 2013-Ohio-3712, ¶ 41, 45 (holding that statements were hearsay when they "went well beyond" describing witness conduct and instead connected the defendant with the crime").

{¶ 58} Although testimony that is offered to explain the subsequent investigative activities of police officers and not to prove the truth of the matter asserted may be admissible under certain circumstances, in order to satisfy that standard """the conduct to be explained should be relevant, equivocal, and contemporaneous with the statements; the probative value of [the] statements must not be substantially outweighed by the danger of unfair prejudice; and the statements cannot connect the accused with the crime charged.""" *In re A.K.* at ¶ 11, quoting *State v. Hill*, 2021-Ohio-294, ¶ 24, quoting *Ricks* at ¶ 27.

18.

**{¶ 59}** Rutledge initially cites testimony by TPD Officer Heban, wherein Heban stated that he heard from Detective Blazevich that a confidential source had told Blazevich that Rutledge "was involved in drug trafficking." While this testimony was given in response to the question, "[W]hat sort of investigation was being conducted on the defendant?," the statement -- properly characterized as "hearsay within hearsay" -- arguably unlawfully connected Rutledge to the charged trafficking offense inasmuch as it provided evidence linking Rutledge, whose identity was unknown to officers until the CI provided his name, to the June 2, 2021 controlled drug sale to the CI. *See Hackney* at ¶ 2, 23 (concluding that officer testimony regarding confidential informant's having identified the defendant as his supplier unlawfully connected the defendant to the trafficking charge that arose from a subsequently-arranged controlled sale of cocaine by the defendant to the confidential informant).

**{¶ 60}** The State argues that the CI's statements to Blazevich were not offered into evidence to prove the matter asserted, namely that Rutledge was known as "Polish" or "P," that he trafficked in narcotics in exchange for cash and/or stolen merchandise, that he operated his criminal enterprise from his Bancroft Street residence, and that the CI could purchase crack cocaine from Rutledge in a controlled buy. Rather, the State argues, these statements were introduced to provide context for Blazevich's investigation.

### a. Harmless Error

**{¶ 61}** Assuming, without deciding, that the CI's anonymous identification of Rutledge did, in fact, constitute inadmissible hearsay, the next step is to determine whether the alleged evidentiary error was harmless. *See In re A.K.* at ¶ 14, citing *State v.* 19.

*Morris*, 2014-Ohio-5052, ¶ 24. Harmless error is "any error, defect, irregularity, or variance which does not affect substantial rights." *State v. Kamer,* 2022-Ohio-2070, ¶ 154 (6th Dist.). "The state bears the burden of proving that the error did not affect a defendant's substantial rights." *Id.,* citing *State v. Moore*, 2021-Ohio-765, ¶ 33 (6th Dist.). "When determining whether a trial court's improper admission of other acts evidence affected the substantial rights of a defendant, an appellate court must (1) determine whether the error prejudiced the defendant (i.e., the error affected the verdict), (2) declare a belief that the error was not harmless beyond a reasonable doubt, and (3) excise the improper evidence from the record, look to the remaining evidence, and determine whether there is evidence beyond a reasonable doubt of defendant's guilt." *Kamer* at ¶ 155, citing *State v. Harris*, 2015-Ohio-166, ¶37. "In other words, 'an appellate court must consider both the impact of the offending evidence on the verdict and the strength of the remaining evidence.'" *Id.*

{¶ 62} Here, the trial court stated specifically that it relied on the audio recording of the controlled buy in finding Rutledge guilty of the trafficking charge. As indicated above, the CI can be heard in the recording saying, "Hey, uh, P. Put that in something for me." In addition, the record contained the jointly-compiled exhibit, identified as State's Exhibit 63, that included the articles of organization that Rutledge had filed with the Secretary of State for Polish P LLC Custom Designs, identifying Rutledge as the LLC's statutory agent. Thus, the CI's statements to Blazevich are cumulative to other admissible evidence.

20.

**{¶ 63}** Based on the foregoing, we do not see how Rutledge suffered prejudice on this record. And based on the strength of the admissible evidence against him, we find that any error was harmless beyond a reasonable doubt. Accordingly, we conclude that the admission of the anonymous identification constituted harmless error.

### b. Plain Error

**{¶ 64}** As an alternative basis for affirming the trial court's decision, we note that because Rutlege did not object and ask for a curative instruction for the testimony at issue, his arguments are to be reviewed under the "plain error" standard of review. Crim.R. 52(B) affords appellate courts discretion to correct "[p]lain errors or defects affecting substantial rights" notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court. *State v. Rogers*, 2015-Ohio-2459, ¶ 22. The accused bears the burden of proof to demonstrate plain error on the record, *Id.*; *State v. Quarterman,* 2014-Ohio-4034, ¶ 16, and must show "an error, i.e., a deviation from a legal rule" that constitutes "an 'obvious' defect in the trial proceedings," *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Even if the error is obvious, it must have affected substantial rights, and "[w]e have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." *Id.*

**{¶ 65}** "To show plain error, an accused is required to demonstrate a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." *State v. Jarrell,* 2017-Ohio-520, ¶ 51 (4th Dist.), citing *United States v. Dominguez Benitez,* 542 U.S. 74, 81–83 (2004) (construing Fed.R.Crim.P. 52(b), the federal analog to Crim.R. 52(B), and also noting

21.

that the burden of proving entitlement to relief for plain error "should not be too easy"). "The existence of plain error satisfies the prejudice prong of the test for ineffective assistance of counsel." *Jarrell* at ¶ 51, citing *State v. Mohamed,* 2016-Ohio-1116, ¶ 37 (8th Dist.). In the case sub judice, we have found no plain error. "Failure to establish either element is fatal to [an ineffective assistance] claim." *State v. Jones,* 2008-Ohio-968, ¶ 14 (4th Dist.). Therefore, if one element is dispositive, a court need not analyze both. *Jarrell* at ¶ 51, citing *State v. Madrigal*, 87 Ohio St.3d 378, 389, (2000) (stating that a defendant's failure to satisfy one of the elements "negates a court's need to consider the other"). As there is no plain error that was committed -- either by the trial court in admitting the disputed hearsay evidence or by Rutledge's trial counsel in failing to object to the admission of said evidence -- Rutledge's ineffective assistance claim necessarily fails.

{¶ 66} Next, Rutledge mischaracterizes certain testimony by Detective Blazevich as Blazevich stating that "he is certain that the [CI] told him that Rutledge sold drugs to him." Looking to the cited portion of the transcript, we find that Blazevich made no such statement or suggestion. Because this portion of Rutledge's argument is wholly unsupported by the record, we will give it no additional consideration.

{¶ 67} Rutledge's first assignment of error is found not well-taken.

**Second Assignment of Error**

{¶ 68} In his second assignment of error, Rutledge alleges that the trial court improperly denied his Crim.R. 29 motion as pertains his conviction for receiving stolen

22.

property. Specifically, Rutledge claims the State failed to establish that he acted knowingly.

{¶ 69} Under Crim.R. 29(A), "The court on motion of a defendant…, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged…, if the evidence is insufficient to sustain a conviction of such offense or offenses…." *State v. Hollstein*, 2009-Ohio-4771, ¶ 26-27, citing Crim.R. 29(A).

{¶ 70} The standard of review for a Crim.R. 29 motion is "the same standard as is used to review a sufficiency of the evidence claim." *Id.* at ¶ 28, citing *State v. Witcher*, 2007-Ohio-3960, ¶ 20 (6th Dist.). Therefore, the relevant inquiry is "whether any rational fact finder, after reviewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, citing *State v. Clemons*, 82 Ohio St.3d 438, 444 (1998).

{¶ 71} Rutledge was convicted of receiving stolen property valued between $1,000 and $7,500, in violation of R.C. 2913.51(A) and (C), a felony of the fifth degree. R.C. 2913.51 relevantly provides that "[n]o person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." R.C. 2913.51(A).

{¶ 72} A person "acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). "Reasonable cause entails determining whether a

23.

person of ordinary prudence and care would believe that the property had been obtained through the commission of a theft offense." *State v. Overholt,* 2003-Ohio-3500, ¶ 22 (9th Dist.), citing *State v. Petty*, 1987 WL 11401 (8th Dist. May 21, 1987); *State v. Bentz,* 2 Ohio App.3d 352, 353 (1st Dist. 1981).

{¶ 73} "Proof of guilt in a criminal prosecution may be made by circumstantial evidence, real/physical evidence, and direct evidence, or any combination of the three, and all three have equal probative value." *State v. Dietrich*, 2024-Ohio-2039, ¶ 13 (11th Dist.), citing *State v. Zadar*, 2011-Ohio-1060, ¶ 18 (8th Dist.). Factors to be considered in determining whether reasonable minds could conclude whether a defendant knew or should have known property has been stolen include: "(a) the defendant's unexplained possession of the merchandise, (b) the nature of the merchandise, (c) the frequency with which such merchandise is stolen, (d) the nature of the defendant's commercial activities, and (e) the relatively limited time between the thefts and the recovery of the merchandise." *Dietrich* at ¶ 16, citing *State v. Davis*, 49 Ohio App.3d 109, 112 (8th Dist.1988).

{¶ 74} In the current case, the State presented substantial evidence tending to prove that Rutledge had reasonable cause to believe the property recovered from his Bancroft Street residence was obtained through the commission of a theft offense. The State presented 61 items that were seized from Rutledge's residence; nearly every item was new and in its original packaging from the manufacturer, and some of those items still had a spider wrap anti-theft device intact. The sheer volume of the merchandise recovered from his residence, together with the state and condition of those items, was

24.

sufficient to establish that Rutledge had reasonable cause to believe that the merchandise was stolen. Accordingly, Rutledge's second assignment of error is found not well-taken.

**Third and Fourth Assignments of Error**

{¶ 75} Rutledge's third and fourth assignments of error rely on the allegation that the trial court permitted the State to introduce previously suppressed evidence. Specifically, he claims this alleged evidentiary error resulted in denying him due process (third assignment of error) and the effective assistance of counsel (fourth assignment of error).

{¶ 76} In the previous case, case No. CR-2022-1199, Rutledge moved to suppress all property seized pursuant to the search warrants executed at his Bancroft Street residence. The trial court denied Rutledge's motion to suppress items seized from his residence, but granted his motion to suppress items recovered from the gold-colored storage container located at his residence. The earlier case was dismissed without prejudice, and Rutledge was reindicted on the same charges in case No. CR-2023-1676, which is the subject of the current appeal.

{¶ 77} Contrary to Rutledge's claim that the State's reindictment was "an attempt to use the suppressed evidence in the new indictment," the State expressly acknowledged the earlier suppression ruling in its opposition to Rutledge's motion to compel, when it stated, "[T]his case incorporates the proceedings in case CR22-1199 including the litigation of the Defendant's Motion to Suppress Evidence."

{¶ 78} Rutledge's claim to the contrary notwithstanding, the State did not admit into evidence "[t]he storage container, suppressed in CR-22-1199…as State's Exhibits 25.

[sic] A in CR 23-1676." Nothing about Rutledge's statement is correct. The State used numbers, not letters, to identify its exhibits. The defense admitted Exhibit A, but that exhibit involved email communication between Detective Blazevich and the prior owner of the storage container, and not the storage container itself.

{¶ 79} In addition, Rutledge has not identified a single item among the 61 items representing State's Exhibits 1-59, 73, and 74, that was previously suppressed. Instead, Rutledge relies on conjecture and innuendo to suggest that some of the testimony and statements that were made on the record could be interpreted to mean that evidence was improperly admitted. For example, Walmart inventory specialist Michael Wright stated that when he went to the police station to review the items seized in relation to this case, he reviewed the items in the "storage unit." Rutledge appears to suggest that this statement means that previously suppressed evidence was improperly admitted by the State.

{¶ 80} Rutledge again relies on implications, rather than facts, when he interprets a discussion on the record regarding storage concerns relating to the 61 items representing State's Exhibits 1-59, 73, and 74. In that instance, the court merely placed on the record that the parties had come to an agreement that the short-term storage solution pending appeal would involve placing certain exhibits into the subject storage container. The record does not reflect that any of these items were originally recovered from the storage container during the search.

{¶ 81} Next, Rutledge appears to complain that when Detective Blazevich testified that the items were found at his "residence," that might have included the gold-colored

26.

storage container located on the property. But the issue of suppression was thoroughly litigated, and the distinction made by the court was that the items found at Rutledge's residence were admissible, whereas the items found in the gold-colored storage unit were not. This distinction appears to have been acknowledged by defense counsel in his opening statement, when he suggested that "some practice" "limited our trial to what it will be."

{¶ 82} Rutledge also attempts to identify items about which the State did not expressly inquire regarding where they were found. As indicated above, the prosecutor questioned Blazevich about all but one exhibit, and in almost every instance asked Blazevich whether the item being discussed had been collected from Rutledge's residence. In every instance that the question was asked, Blazevich answered in the affirmative. In an apparent oversight, the prosecutor did not ask Blazevich whether he had recovered certain of the exhibits from Rutledge's residence, including State's Exhibit 16, a Cricut machine, stated as having a value of $169.00; State's Exhibit 26, an Orbi Netgear Wi-Fi system, which was never considered for its valuation; State's Exhibit 31, a socket set, which was never considered for its valuation; and State's Exhibits 38 and 42, which were knives that were never considered for their valuation. In addition, the prosecutor never explicitly asked Blazevich anything about State's Exhibit 17, which was a Shark Vac Mop, stated as having a value of $479.00.

{¶ 83} Both the $169 Cricut machine and the $479 Shark Vac Mop appear to have been included in the total Walmart loss valuation of $2,582.94. Even if the total valuation of $2,582.94 were reduced by $648 (the sum of $169 and $479), the total loss valuation

27.

would be $1,934.94, which still supports Rutledge's conviction for receiving stolen property valued between $1,000 and $7,500.

**{¶ 84}** To the extent that there remains any residual question about whether previously-suppressed was used to support Rutledge's conviction for receiving stolen property, we note:

> A general principle of appellate review is the presumption of regularity, that is, a trial court is presumed to have followed the law unless the contrary is made to appear in the record. Thus, the court of appeals generally presumes regularity in the proceedings below, and all presumptions will be indulged in support of the validity and correctness of the proceedings below. Also, in appeals, all reasonable presumptions consistent with the record will be indulged in favor of the legality of the proceedings below. The law presumes that the decree or judgment was made upon proper grounds; that the court below applied the law correctly; that a trial judge performed one's duty and did not rely upon anything in reaching a decision upon which one should not have relied; and that the action below was justified.

*State v. Phillips,* 2022-Ohio-1262, ¶ 24 (2d Dist.), quoting 5 Ohio Jurisprudence 3e, Appellate Review, Section 454.

**{¶ 85}** Applying the plain error standard outlined above in our analysis of Rutledge's first assignment of error, we find that Rutledge has failed to establish that either the trial court or defense counsel committed plain error in connection with the admission and consideration of seized evidence. Accordingly, Rutledge's third and fourth assignments are found not well-taken.

28.

**Fifth Assignment of Error**

{¶ 86} Rutledge points out in his fifth assignment of error an error in the trial court's sentencing entry, which states that Rutledge was convicted of "Trafficking in Cocaine in Count 1, a violation of R.C. 2905.03(A)(1) and (C)(4)(a), a felony of the fifth degree," rather than a violation of R.C. 2925.03(A)(1) and (C)(4)(a). The State concedes the error and urges the court to remand the matter to the trial court for correction of the sentencing entry.

{¶ 87} The law is clear that "[a] nunc pro tunc judgment entry may be used to 'correct clerical mistakes in judgments or orders arising from oversight or omissions.'" *State v. Cox*, 2025-Ohio-307, ¶ 15 (6th Dist.), quoting *State v. Thompson*, 2024-Ohio-991, ¶ 13 (6th Dist.), citing *State v. Voyles*, 2010-Ohio-90, ¶ 10 (6th Dist.). "A 'clerical mistake' refers to a mistake or omission, mechanical in nature and apparent on the record, which does not involve a legal decision or judgment. (Citations omitted.)" *Id.*

{¶ 88} We find that the error in this case is properly characterized as a clerical mistake. Therefore, we remand the matter to the trial court for the limited purpose of issuing a nunc pro tunc entry that conforms to Rutledge's conviction for trafficking in cocaine.

{¶ 89} Rutledge's fifth assignment of error is found well-taken.

## Conclusion

{¶ 90} The judgment of the Lucas County Court of Common Pleas is affirmed in part and reversed in part. The matter is remanded to the trial court for the limited purpose of issuing a nunc pro tunc entry that conforms to the Count 1 conviction for trafficking in

29.

cocaine that was entered in this case. Appellant and appellee are ordered to divide the

costs of appeal pursuant to App.R. 24.

Judgment affirmed, in part, reversed, in part, and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Myron C. Duhart, J.

_____
JUDGE

Charles E. Sulek, P.J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.